
E-FILED
Thursday, 21 September, 2006  09:31:28 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS


THOMAS O'FARRELL,

       **Plaintiff,**

                              05-1074

  **vs.**

DR. ARTHUR FUNK and
NURSE PEGGY SHIPLEY,
         **Defendants.**

## ORDER

Before the court are the defendants' motion to dismiss or in the alternate for summary judgment [25], the plaintiff's response [40], the defendants' reply to the plaintiff's response [43] and the plaintiff's response to defendants' reply [44].  If matters beyond the pleadings are considered, the court must treat a motion to dismiss as one for summary judgment and give adequate notice to the non-movant.  *See Ribondo v. United Airlines, Inc.*, 200 F.3d 507, 510 (7th Cir. 1999); *Aviles v. Cornell Forge Co.* , 183 F.3d 598, 604 (7th Cir. 1999).  The court notes that the plaintiff was provided notice of the defendants' summary judgment motion when the defendants mailed a copy of said motion to him, and via the clerk of the court's January 9, 2006 letter to the plaintiff notifying him that the motion had been filed and advising him that his response was due within 21 days.

## Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.56(c); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)*; Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied*, 470 U.S. 1028 (1985).  In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party.  *Beraha v. Baxter Health Corp.,* 956 F.2d 1436, 1440 (7th Cir. 1992).  Further, this burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837.  A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position.  *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994).  The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in

affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence. *Chemsource. Inc. v. Hub Group. Inc.*, 106 F. .3d 1358, 1361 (7th Cir. 1997). Credibility questions "defeat summary judgment only '[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility.'" *Outlaw*, 259 F.3d at 838, *citing* Advisory Committee Notes, 1963 Amendment to Fed. R. Civ. P. 56(e)(other citations omitted). While the facts must be viewed in the light most favorable to the party opposing summary judgment, this means no more than that "the party opposing a summary judgment motion is to be given the benefit of all reasonable doubts and inferences in determining whether a genuine issue exists that justifies proceeding to trial." "A court never is required to accept evidence that is inherently incredible or 'too incredible to be accepted by reasonable minds.'" "There must be a degree of substantiality to the evidence proffered in opposition to a summary judgment motion if the motion is to be defeated." *Agosto v. Immigration and Naturalization Service*, 436 US. 748, 772-773, 98 S.Ct 2081, 2095, 56 L..Ed.2d 677 (U.S. 1978) (Powell &Rehnquist, dissent), *citing* 10 C *Wright & A. Miller*, Federal Practice & Procedure § 2725, p.512 (1973)

Fed. Rule Civ. Pro. Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial." *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359 (7th Cir. 1988). A "metaphysical doubt" will not suffice. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Disputed facts are material only if they might affect the outcome of the suit. *First Ind. Bank v. Baker,* 957 F.2d 506, 507-08 (7th Cir. 1992). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, *247-248, 106 S.Ct. 2505, 2510 (1986).

## Background

The plaintiff, Thomas O'Farrell is a prisoner incarcerated within the Illinois Department of Corrections. He brings his lawsuit pursuant to 42 U.S.C. 1983. He sues Dr. Arthur Funk, alleging his failure to provide him with disc surgery on his cervical spine in a timely fashion constituted cruel and unusual punishment in violation of the Eighth Amendment. Nurse Peggy Shipley is sued because she allegedly refused to end cervical traction sessions though the plaintiff pleaded with her to stop because it was painful.

The defendants argue that Mr. O'Farrell received constant attention and appropriate treatment. Defendants further argue that the plaintiff sues because he disagreed with Dr. Funk's treatment plan, and wanted him to provide care as Mr. O'Farrell dictated. Further, the defendants argue that this case presents a classic example of a suit by an inmate who receives treatment, but sues because his physicians do not provide him with the specific treatment he desires. Further, the defendants argue that the allegation against Nurse Shipley is  without support in the records

2

and fails to find support even among the facts pled in the plaintiff's amended complaint. The defendants move for summary judgment in their favor arguing that the credible facts of record offered in support of their motion show that Mr. O'Farrell received all due and proper care and that his assertions to the contrary are incorrect. The defendants assert that there are no *genuine* issue of material fact and defendants are entitled to judgment as a matter of law.

### Statement of Undisputed Facts[1]

1. Mr. O'Farrell began his incarceration in 1995. His medical history included complaints of chronic low back pain and migraine headaches, but he was otherwise generally healthy. The first time he complained of any symptoms in his upper back was an urgent care visit to the infirmary on November 11, 2002. He was seen first by Peggy Shipley, R.N. (Exh. 11 A, p. 1).

2. He complained of pain in his upper back that radiated into his shoulder and down to his hip. Shipley had Mr. O'Farrell seen by Dr. Trainor, who noted that the plaintiff complained of pain below the right scapula. There was no specific injury and it had begun the night before while he was sleeping. Apart from some point tenderness over the scapula, his physical exam was grossly normal. Dr. Trainor diagnosed it as a muscle strain and ordered a medical lay-in for that day, plus 600 mg of Motrin. (Exh. A, p. 2).

3. Mr. O'Farrell did not stay in the health care unit and he signed a refusal of treatment form. (Exh. A, pp. 3-4).

4. He did not again complain of any problems until June 1, 2003. He said that he had a pinching sensation in his right shoulder blade and tingling in his right arm. This had been present for a week. Dr. Dennis Larson found him non-tender to palpation and diagnosed him with neck, back and right upper extremity discomfort. Dr. Larson ordered 600 mg of Motrin and told O'Farrell to avoid strain. (Exh. A, pp. 5-6).

5. On June 19, 2003, O'Farrell complained that he still had upper back, neck and shoulder pain, and that the Motrin was not providing him with relief. He was examined by a member of the medical staff, who found no swelling and good range of motion. He was told to report to sick call. (Exh. A, p. 7).

6. He did so three days later, on June 22, 2003, and was seen by Dr. Larson. Mr. O'Farrell complained of a numbing sensation in his mid-upper back. Pain was "present all the time," and he had a spasm that "brings tears to him." He had a history of surgery and a gunshot wound to his right shoulder. He had good range of motion in his neck and arms, and no tenderness. Dr. Lason ordered X-Rays of his chest and neck. (Exh. A, pp. 8-9). These were

---

[1]The plaintiff did not provide any additional facts in his response. Further, exhibits referred to, unless noted otherwise, can be found attached to defendants' memorandum of law in support of their motion for summary judgment [26].

3

taken June 25, 2003.   (Exh. A, p. 273).

7.   A month later, on July 24, 2003, Mr. O'Farrell complained to a corrections med tech that he had sharp pains that had been there for a long time, which he thought might be from a pinched nerve in his right shoulder related to the gunshot wound.  He said he had been previously seen "by numerous doctors," and nothing had helped.  He was put on the sick call list. (Exh. A, pp. 10-11).

8.   He was seen the same day by Dr. Larson.  Dr. Larson noted that he complained of episodic right parathoracic pain.  It was sharp, and unrelated to certain movements or breathing.  He had tenderness in his back when hyperextending it, but full range of motion   He noted that the chest X-Ray had been negative and diagnosed a cervical strain and degenerative joint disease at C5-C6.  Dr. Larson put him on Robaxin 750 m *t. i.d.* for 30 days (Robaxin is a muscle relaxant).  (Exh. A, pp. 1 1-1 2).

9.   He did not seek treatment again for a month. He had an urgent care visit on August 23, 2003.  He told the nurse that since morning, he felt shooting pain from his shoulder down into his right hand.  He had full range of motion but complained this was only with great pain.  He was then seen by Dr. Kevin Smith, who noted that he awoke this morning with right-sided neck pain radiating down into his hand.  The X-Ray of his neck revealed  "an osteophyte" and degeneration at C5-6.  On examination he was in moderate distress with tenderness in his right lateral neck on hyperextension and bilateral flexion of the neck. His arms were symmetrical with no muscle atrophy.  He was diagnosed with cervical  pain  with a radicular component.  He was prescribed Toradol (an injected  non-steroidal anti-inflammatory) and Ativan (a  sedative). In an addendum  written 90 minutes later,  Dr. Smith noted that Mr. O'Farrell  improved after being administered the medications.  He further ordered a medical lay-in  for  five days, and  put him on Motrin, Robaxin, and Neurontin (used to treat neuropathic pain).  Last, he referred Mr. O'Farrell to the Medical Director for follow-up of his radiculopathy and possible diagnostic testing.  (Exh. A, pp. 13-1 5).

10.   Defendant Dr Arthur Funk, the Medical Director, first saw Mr. O'Farrell three days later, on August 26, 2003.  Mr. O'Farrell told him that beginning on August 23, he developed severe pain in his right  neck and shoulder radiating down his right arm.  He had numbness in his first, second, and third fingers but no weakness.  He had a history of multiple surgeries for rotator cuff  repair on the right shoulder.  He appeared to be in mild discomfort and held his neck  rigidly.  His physical exam  was normal except that the range of motion in his neck was limited by pain.  He assessed  him with C5-6  related radiculopathy on the right side.  Dr. Funk then entered  multiple orders:  ( I ) a 2 week  medical lay-in, (2) a prednisone stat  pack starting at 60 mg for the first day then dropping by 10 mg the next day, (3) an X-Ray of his cervical spine the next day, and (4) follow-up on sick call in two weeks.  He also explained the diagnosis to Mr. O'Farrell and told him under what circumstances he should come back to medical sooner  than scheduled.  (Exh. A, pp. 16-1 7).

11.   The X-Ray  was taken on Aug. 29, 2003.  (Exh. A, p. 274).

4

12.   On September 7, O'Farrell was seen  by Dr. Ngu.  He complained of back and posterior neck pain radiating to his arm and related a history of C5-C6 degenerative changes.  Dr. Ngu noted he appeared to be in distress as he related  his vital signs and symptoms.  He had limited range of motion of his right shoulder secondary to the pain.  Dr. Ngu diagnosed cervical radiculopathy and ordered a 5 day lay-in, and prescribed Toradol and Indocin.  He also referred the case to Medical Director Dr. Funk for follow-up.  (Exh. A, p. 18).

13.   Before that happened, on September 11, 2003, he returned to medical through sick call and was again seen by Dr. Smith.  He reported some relief with pain meds but not complete relief.  He had some limitations to his range of neck motion with moderate pain.  He had some loss of grip strength in his right hand.  There was no atrophy, however, and he was neurologically intact.  He was given an injection of Toradol.  Dr. Smith contacted Dr. Funk to further discuss Mr. O'Farrell's case.  They decided to admit him to the medical department and additionally administer a Prednisone stat pack of 100 mg, and ordered the narcotic pain reliever Darvocet, Robaxin, and Zantac.  (Exh. A, pp. 19-20).

14.   He remained in the health care unit for that day and into the next day.  Dr. Funk saw him on the 12th.  Mr. O'Farrell told him that the pain meds were making it tolerable but he was still hurting.  He also said he wanted to go back to his cell since he would be doing the same thing there that he was in the health care unit.  Dr. Funk examined him and allowed him to be discharged to his cell.  He ordered that he report for the next sick call.  (Exh. A, pp. 21-27).

15.   He was next treated on September 18, 2003.   Dr. Smith noted he had neck pain and reduced range of motion.  He still had normal reflexes and no atrophy but some decreased hand strength on the right.  Dr. Smith reassured him, ordered that he be on medical lay-in  for a week, and prescribed Motrin and Robaxin. (Exh. A, p. 28).

16.   Later that day he was seen by Dr Funk.  He told Dr. Funk the pain had gone from 6 out of 10 to "indescribable" pain in his right elbow and right shoulder with movement.  Dr. Funk noted that he'd previously been in the infirmary but refused to stay there.  He also noted that while plaintiff was angry and hostile, he did  not appear to be in acute distress.  He measured the circumferences of Mr. O'Farrell's upper arms and forearms and found them symmetric.  He noticed no loss of hand strength, and full biceps strength.  There was a questionable loss of tricep strength.  There  was no history of recent trauma.  Dr. Funk ordered that he be admitted to the infirmary and not released except under orders.  His current medication regimen was to be continued and he was given additional Darvocet.  He was educated in detail regarding the source of his pain and the plan of treatment which was being pursued.  (Exh. A, pp. 29-31).

17.   Mr. O'Farrell was admitted  to the infirmary and  kept under constant observation for the next 10 days.  (Exh. A, pp. 11-50).

18.   At the time of his admission  he declined a nurse's offer of  Darvocet.  (Exh. A, p.

34).

19.   About 2 pm the next day he asked for the Darvocet and talked to Dr. Bulatovic.  He said the pain  was still there but that the Darvocet  took off "the edge."  (Exh**.** A, pp. 35-36).

20.   While he was in the infirmary, when he asked for pain medication, he was given more Darvocet.  (Exh. A,, pp. 40,42,44,45).

21.   On Sept. 23,  2003,  he saw Dr. Funk, who noted that the patient had been admitted for narcotic pain control.  He hadn't asked for any pain medicine for over a day.  The infirmary space was also needed for another patient.  Dr. Funk discharged him on the same medication orders, less the Darvocet.  He told Mr. O'Farrell to return at noon the next day.  He also noted that he had scheduled him for an MRI on Sept. 25.  (Exh. A, pp. 48-50).

22.   Dr. Funk saw him again the next day at noon.   Mr. O'Farrell said he thought the Darvocet "messed [him] up;" he was constipated and dizzy.  His pain was an "8."  He was examined and exhibited the same signs and symptoms he had previously.  Dr. Funk's diagnosis continued to be radicular pain pobably secondary to a cervical disc problem.  He discontinued his narcotic Darvocet. The plaintiff signed a refusal of treatment form indicating he refused to be admitted to the infirmary.  He was given an extended medical lay-in of four weeks and reminded of his MRI the next day.  (Exh. A, pp. 51-52).

23.   The MRI was performed on September 26, 2003.  (Exh. A, pp. 275-276).

24.   He was next seen Oct. 1, 2001, for follow-up on his MRI.  Mr. O'Farrell explained his pain began in his right lower neck and extended along his shoulder into his arm.  He had numbness of all his right hand fingers.  He said his pain hadn't increased or decreased in the last week.  Dr. Funk noted that he held his neck rigidly but did not appear to be in significant pain.  He wrote that Mr. O'Farrell complained of pain with minimal rotation of his head.  He measured his arms, which still showed little difference between sides.  Dr. Funk noted that the MRI had shown some degenerative changes but there was no cord or nerve root compression, which would be expected if  he had radicular pain and numbness.  In light of that finding he took him off Neurontin, which  was no longer indicated, and continued his Robaxin and Motrin.  He also gave him range of motion exercises to perform on his own, and ordered him to present to the orthopedic clinic on October 14, 2003, so he could be examined by an orthopedic surgeon who rounded in the facility.  (Exh. A, pp. 53-55).

25.   On Oct. 14,  Mr. O'Farrell was seen by Dr. Upendra Kumar Sinha, an orthopedic surgeon from Streator.   Dr. Sinha noted the inmate complained of cervical pain and referred pain into the right arm.  His symptoms had increased over August.  He had restricted, painful range of motion in his cervical spine.  He had a straightening of the normal curvature of the cervical spine (kypllosis), and a significant loss of grip and pinch strength in his right arm.  He noted the MRI showed changes at multiple levels.  His impression was cervical spine osteoarthritis at C5-6 and C6-7, and cervical spondylitis (inflammation).  He issued several orders.  First, a cervical

traction kit was to be used.  Next, he was to have an EMG (electromyelogram) of his right upper arm.  Last, he was to report back at the next ortho clinic.  (Exh. A, pp. 55-56).

26.   The plaintiff's October 16, 2003 medical records show that an order for a traction kit was submitted and a request for an EMG was made.  (Exh. A pp. 57, 278-279).

27 .  Mr. O'Farrell was taken to Decatur Memorial Hospital on Oct. 22, 2003, where the EMG was performed.  When he returned, he was seen by a nurse, complaining of severe neck pain; a "9".  Dr. Larson was consulted, who ordered Motrin and Robaxin and a two week medical lay-in.  (Exh. A, p. 58).

28.   Dr. Funk noted on the chart the same day that he spoke with Dr. Sinha.  He clarified the traction order:  Mr. O'Farrell was to be given 6-8 lbs of traction for 20 minutes twice a day for an initial period of 4-6 weeks.  (Exh. A, p. 59).

29.   The next orthopedic clinic was only a few days later, and Mr O'Farrell was seen again by Dr. Sinha on Oct 28 .  He again noted that plaintiff had restricted, painful cervical range of motion and decreased grip and pinch strength on the right side.  It was also noted that Dr. Funk discussed the results of the EMG with Dr. Sinha.  (Exh. A, p. 60).

30.   The EMG showed evidence of right C6 radiculopathy. (Exh. A, pp. 258-259).

31.   On November 1, 2003, a CMT saw the plaintiff, who complained of  "nerve damage in his neck."  His medications were renewed.  He showed up to sick call the next day, complaining of severe neck  pain and stiffness.  He was seen and evaluated by a CMT, who noted he was under the care of an orthopedic surgeon.  He ordered Motrin and Robaxin and a medical lay-in of 2 weeks.  (Exh. A, p. 61).

32.   He was seen by another M.D., Dr Suresh Vade, on November 16, 2003.  The doctor noted that Mr. O'Fanell had been seen by Dr. Sinha and Dr. Funk and that they had ordered and completed an EMG .  He also noted that a consult with a neurosurgeon had been ordered.  Mr. O'Farrell's pain medications were renewed.  (Exh. A, p. 62).

33.   In a report of Mr. O'Farrell's psychiatric progress on November 23, 2003.  Regarding his current health status, Dr. Andrew Kowalski wrote:

> **SUBJECTIVE DATA***:*   The patient's only complaint is chronic neck pain.  According to the patient he has had all  the studies,  he has met with the appropriate health care professional, and now he is simply waiting for cervical neck surgery to occur.  The patient is dealing with his daily pain fairly well.

(Exh. A, p. 272).

34.  On November 25, 2003, Mr O'Farrell was sent out to see a neurosurgeon, Dr. Marie Long.  On her physical exam, she noted that "any attempt at moving his neck in any direction is accompanied by a red face, venous engorgement, and vocalization."  She noted that she found no wasting or atrophy in any of his muscle groups, but giveaway weakness in all muscles of his right arm.  His reflexes were easily obtainable and he had some loss of sensation in his fingers.  Dr. Long noted that the MRI which had been performed was done on an open magnet and was of poor quality.  She recommended a repeat MRI on a closed magnet.  Her impression began "persistent right arm pain with no definite neurologic deficit today, and with some evidence of pain behavior. . "  She noted that she could not continue treating Mr. O'Farrell for insurance reasons (both Mr. O'Farrell's coverage and her own liability insurance) and recommended further follow-up including the closed MRI.  (Exh. A, 260-261).

35.  Shortly thereafter, Dr. Funk noted on the chart that he'd spoken with Dr. Long.  She told him she'd seen no problematic disc at C6 on the MRI but that, according to the EMG, there was "suboptimal outflow" through the nerve.  She also told him that Mr. O'Farrell's responses on examination "seemed exaggerated," and his reactions were not consistent with nerve impingement at level C6. (Exh. A, p. 64).

36.  On Dec. 4, 2003, plaintiff reported to a CMT complaining of pain from a "pinched nerve."  He told the CMT that he wanted Motrin and Robaxin, as they had provided him with relief in the past.  He was ordered to report to sick call. (Exh. A, p. 65).  Dr. Funk noted on the chart the same day that he had spoken to Dr. Long, who told him it was unlikely she would be able to provide any services in the area in the future and that he may have to seek a consult with someone else.  Accordingly, Dr. Funk ordered a referral to University of Illinois Neurosurgery for a CT cervical myelogram and follow-up.  (Exh. A, p. 65).  Mr. O'Farrell was seen in the prison on Dec. 7, 2003 by Dr. Vade, complaining of spasmodic muscle pain in his arm.  Dr. Vade noted the pending consult and renewed his pain medications.  (Exh. A, p. 66).  On Dec. 12, Dr. Funk learned that Dr. Long would, indeed, not be providing services in the area.  A neurosurgery consult was scheduled with University of lllinois Neurosurgery on 12/22/03 which would include a CT Myelogram.  He also directed that copies of the MRI and the EMG results be sent with Mr. O'Farrell when he was sent out for the consult.  (Exh. A, p. 67, 283-284).

37.  Dr. Funk also made Mr. O'Farrell aware of Dr. Long's inability to treat him. (Exh. **A,** p. 285).

38.  Mr. O'Farrell was seen by a med tech on Dec. 31, 2003, asking for Motrin.  His medications had expired, so he was told to report to sick call.  (Exh. A, p. 70).

39.  He was seen by an M.D. the same day, who examined him.  He was in no acute distress and his symptoms and complaints were the same as they had been previously.  (Exh. A, pp 71-72).  His medications were renewed.

40.  On January 7, 2004,  Dr. Long's status apparently changed and Dr. Funk was

notified that her office would be able to consult and provide care to Mr. O'Farrell.  Dr. Funk accordingly ordered another MRI (closed instead of open this time).  (Exh. A, pp. 286-287).

41.  Dr. Funk also noted that he would see Mr. O'Farrell in his clinic to advise him regarding the test.  (Exh. A, p. 73).

42.  On Jan. 13, 2004,  Mr. O'Farrell was seen by Dr. Funk.  He noted that the EMG was positive for right C6 radiculopathy. The open MRI  he'd undergone did not show this.  Mr. O'Farrell complained that his arm felt like it was "falling asleep," and his entire limb was affected.  He complained of pain when his arm  was bumped.  Dr. Funk noted that Mr. O'Farrell had his head flexed slightly to the right and his right arm pressed closely against his torso.  His aims were symmetric and without atrophy.  He yelled out in pain when his brachioradialis and triceps reflex was tested.  He had no hand atrophy and his hand grasp strength and ranges of motion improved with encouragement.  With all these findings, Dr. Funk noted that Mr. O'Farrell's complaints were inconsistent with what the tests had objectively shown.  He observed that Mr. O'Farrell appeared to be motivated by secondary gain. Dr. Funk offered Mr. O'Farrell the chance to be admitted to the infirmary for more comprehensive pain control, which Mr. O'Farrell refused. (Exh. A, p. 288).

43.  The closed magnet MRI was already scheduled, and after that he would follow-up with Dr. Long. (Exh. A, pp. 74-76).

44.  On Jan. 20, 2004, Mr. O'Farrell was sent out for the closed MRI, and was returned to the prison with the scan.  (Exh. A, p. 262).

45.  Dr Funk ordered that it be sent to Dr. Long for her follow-up with Mr. O'Farrell. (Exh. A, p. 77).

46.  Plaintiff was seen by a CMT and then by a doctor on Jan. 22, asking for pain meds, which he was given. (Exh. A, p. 78).

47.  Mr. O'Farrell was to see Dr. Long on Feb. 3, 2004, but the officer who was to transport him called Dr. Funk and said that a snowstorm made travel dangerous and the appointment was rescheduled.  (Exh. A, p 79).

48.  Mr. O'Farrell was sent to Dr. Long on Feb. 17, 2004.  She noted the new closed magnet images were much better.  The MRI showed three deficits, at thee vertebral levels in Mr. O'Farrell's neck.  There was a bulge at C3-4 which she believed was noncontributory.  There was degeneration of the disc at C5-6, which she thought might be causing his neck pain.  There was a herniation of the disc at C6-C7 which appeared to be impinging on the nerve root on the right, which she believed consistent with his symptoms.  She recorded that she explained to Mr. O'Farrell that these findings did not present any threat of death, paralysis, or any serious disability in the long term. She said that she could perform a C5-6 and C6-7 discectomy and fusion, which she felt had about a 7/10 chance of affecting his pain and a 3/10 chance of having

9

no effect.  She explained all the risks attendant to the surgery and noted Mr. O'Farrell wanted the surgery.  She then noted she would speak with Dr. Funk about it. (Exh. A, pp. 264-265).

49**.**  On Feb. 23, 2004, Dr. Funk received Dr. Long's consult note, and also spoke with her at length on the phone.  Dr. Long's recommendation was to exhaust nonsurgical treatment options such as cervical traction and a course of epidural steroids.  Mr. O'Farrell would then undergo a repeat EMG and perhaps a CT myelogram and be reevaluated.  Dr. Funk accordingly ordered that he be admitted to the infirmary for cervical traction beginning with 5 lbs for 5 to 10 minutes, as tolerated, twice a day, increasing the weight by 5 lbs in the second and third weeks for a total of four weeks.  (Exh. A, p. 80).

## Cervical Traction

50.  Mr. O'Farrell was admitted to the infirmary and remained there for the next twenty days.  (Exh. A, pp. 81-84).

51.  On the very first day of his admission, the nurse noted the following when traction was performed: "You know, I'm supposed to have surgery. Ow, Ow, get it off!  It hurts!  My neck hurts worse!  Get it off!  Tell Dr. Funk he's going to have to do something else." (Exh. A, p 85).

52.  The nurse noted that as a result, traction was in place for only one minute before it was removed.  "Offender then began demanding Ibuprofen and Robaxin."  She notified Dr. Funk, and his orders from Jan. 22, 2004 for those medications were followed.  Dr. Funk ordered that they try traction at half the weight - 2 ½ lbs.  (Exh. A, pp. 85-86)

53**.**  Later that day another nurse noted Mr. O'Farrell demanded to see Dr. Funk before he left that day.  Dr. Funk did not see him, but another doctor did.  Mr. O'Farrell told him "that traction made my pain worse, doc."  He claimed that he was unable to tolerate cervical traction.  He related that he "wanted another alternative medical management (or surgical) option considered."  The doctor noted that there was no swelling and no sensory deficits; just Mr. O'Farrell's subjective complaint of pain.  He doubled the Robaxin dose to 1500 mg for 3 days and ordered traction at just 2 lbs, to be increased at 2 lb intervals instead of 5 lbs as originally planned.  He noted that he discussed this at length with Mr. O'Farrell.  (Exh. A, pp. 87-88)

54.  Traction was attempted again the next day, beginning at 2 lbs, by nurse Peggy Shipley.  She noted in the medical records that Mr. O'Farrell "immediately demanded we take it off ....Traction on for about 30 seconds.  Refuses to try again. Refuses to sign refusal." (Exh. A, pp. 90-91,294).

55.  He was seen within the hour by an M.D., Dr. Mohammed Choudry, who examined him and found that he had full 5/5 strength and normal reflexes.  His biceps and triceps grip strength was strong.  There was no evidence of paraspinal muscle spasm.  He explained the nature of radicular cervical pain to Mr. O'Farrell and added to his medication regime 2 tabs of Percogesic, three times a day for the next two days.  (Exh. A, pp 91-92).

56.  The doctor saw him a few hours later in the day and noted his pain was better. (Exh. A, p. 93).

57.  On the next day, March 3, 2004, Mr. O'Farrell told the nurse that 2 lbs was too much, "Can you ask Dr. Funk to lower the amount."  Dr. Funk was contacted and gave a telephone order for 1 lb of traction, twice a day, for 5 to 10 minutes.  (Exh. A, p. 94).

58.  Traction was then initiated, but ended after only two minutes. (Exh. A, p. 95).

59.  He was examined by Dr. Choudry, who noted his physical findings were all normal - full strength, no wasting, and he even tolerated resistance.  He held his neck stiffly and complained of limited range of motion due to pain.  (Exh. A, p. 96).

60.  On this day, a second session of traction was actually able to be applied, but it once again lasted only two minutes because Mr. O'Farrell complained that it hurt too much. (Exh. A, p. 97).

61.  Dr. Funk noted that he was complaining of pain with even minimal weight. He directed that Mr. O'Farrell was not to be released from the infirmary until the problem with cervical traction was completed.  (Exh. A, pp. 97-98).

62.  On the next day traction was again attempted with only 1 lb of weight.  Nurse Shipley noted that, first, Mr. O'Farrell laid his head on his shoulder, making it almost impossible to put the traction harness on.  He then immediately demanded that it be taken off, saying "I can't stand it."  After encouraging him to relax and calm down, he reached up and removed the harness himself.  She notified Dr. Funk.  In the afternoon, traction was again attempted.  This time, he kept it on for three minutes before removing it himself.  She noted that he was non-complaint with the traction and had poor impulse control.  Dr. L.arson examined him.  He made no change in orders and wrote that traction should continue. (Exh. A, pp. 99-101).

63.  The next morning, a nurse and an orderly were delivering medicine and food. They observed Mr. O'Farrell standing normally and his shoulders were held in a normal stance. The nurse recorded:

> [H]e looked up and saw us with food and meds and immediately he
> is in a rigid pose with his head forced far to the right shoulder and
> his right arm up to his chest .

(Exh. A, p. 102).  Dr. Larson saw him an hour later and noted he was flexing his neck to the right and elevating his right shoulder.  He measured his upper extremities and again noted no difference between left and right.  He advised Mr. O'Farrell to assume a correct posture, to work on his range of motion, and to continue with cervical traction.  (Exh. A, p. 103).

64.  They then attempted traction again.  Traction was in place less than two minutes

11

before he reached up and released the weight.  Nurse Shipley noted that he "moan[ed] and groan[ed] and grunt[ed] until his face was beet red."  She reported this to Dr. Funk, who ordered that traction weight be reduced still more, to just ½ lb. (Exh. A, p. 104).  This was repeated in the afternoon traction session. (Exh A, p. 105)

65.  The next morning, plaintiff complained to nurse E. Turner that he would not undergo traction until he was seen by Dr Trainor.  He was noted to continue to hold his head cocked to the right side his right shoulder immobile.  He "turn[ed] his whole upper body as one unit" instead of turning his head or neck when she evaluated him.  Traction was refused. (Exh. A, p. 108).

66.  Dr. Trainor saw him at 2:20 and made an extensive note.  Dr. Trainor noted his symptoms and his posture.  He did a thorough physical exam.  He noted that Mr. O'Farrell's deep tendon reflexes in his biceps, blachioradialis, and triceps were all reduced, but, strangely, this was on both right and left sides.  He reported reduced sensation on the right side, but noted that this was reported "subjective numbness."  His diagnosis was multilevel cervical spondylosis, and paracervical and right trapezius musculoskeletal contractures, none of which was new.  For his plan, Dr. Trainor wrote the following:

> (1) Inmate has severe muscle spasm/contracture - would recommend attempts to treat conservatively. Muscle relaxants (Valium 5 mg. . . . Baclofen 10 mg p.o. t.i.d.) or pain specialist - trigger point injections followed by traction.

> (2) Inmate has tried oral anti-inflammatories without relief. Would recommend C-Spine epidural steroids, especially at (25-6, C6-7.

> (3) Would avoid surgery if possible in patient this young with multi-level disease of C-spine and severe contractures. If surgery needed as a last resort, would obtain pre-op cervical spine myelogram with post-myelogram CT Scan Also would strongly consider laminoplasty versus multilevel ACDF [anterior cervical disc ftision] (with ACDF at C5-6, C6-7, patient would probably require additional ACDF at C.3-4 in the future as well as being predisposed to adjacent level spondylosis.).

(Exh. A, p. 109)

67.  He saw Dr. Suresh Vade the next day, who noted he held his head to the right and complained he couldn't move it secondary to pain.  Dr. Vade noted that he refused to undergo cervical traction in spite of the reduced weight.  (Exh. A, p. 111).

68.  That afternoon traction was attempted again and he demanded that it be taken off noting "it hurts so much."  The nurse discussed with him the assessments of Drs Trainor and

12

Vade, both of whom recommended traction.  He relented and underwent five minutes of traction. He was noted to be in no acute distress thereafter (Exh. A, pp 112-1 14)

69.  On Mar. 8, 2004, Nurse Shipley provided traction in the morning.  She noted that Mr O'Farrell tolerated it well for five minutes then demanded that it be removed.  Dr. Vade saw him that afternoon. Plaintiff complained that the traction was not working and was upset.  Dr. Vade said he would talk to the medical director.  He did so, and they added Valium to his medical regimen. (Exh. A, p. 1 15-1 17)

70.  That afternoon, nurse P McKinsey went by Mr. O'Farrell's cell and saw him eating, with his right arm relaxed at his side, instead of elevated as he had been doing, allegedly because of pain.  Three hours later the same nurse went in to deliver his medications and Mr. O'Farrell was walking in his cell.  (Exh. A, p. 11 8).

71.  The next morning, Mar. 9,2004, nurse Shipley noted that when she delivered Mr. O'Farrell's medication, he threw his head back to swallow the pills and showed no sign of muscle contracture.  He underwent traction that morning, complaining of pain after two minutes. He left it on for five minutes before removing it himself.  She explained to him that if he didn't want the traction, he had to sign a refusal form; otherwise the nurses were under doctor's orders to provide traction twice a day.  He refused to sign the refusal form. (Exh. A, pp. 119-120).

72.  The next day nurse McKinsey noted that he was holding his right shoulder and neck in a rigid posture again.  Dr. Funk was advised that the nurses were suspicious that he was not genuinely guarding but assuming this posture voluntarily.  He instructed nursing staff to randomly observe Mr. O'Farrell's behavior and document their observations each shift.  (Exh. A, p. 122).

73.  That afternoon, Mr. O'Farrell was seen by Dr. Choudry, complaining that he now had tingling on his left side, too. Dr Choudry diagnosed him with radicular pain and "selfinduced spasm." He told plaintiff that trying to hold his neck in the wrong position, as he was, would actually worsen his problem, and that it was the reason he was now experiencing tingling on his left side.  He talked about trigger point injections, which Mr O'Farrell wanted to do.  He administered two trigger point injections which were tolerated well. He also noted that he was holding his head completely vertical and that this was corroborated by a correctional officer. (Exh. A, pp. 123-124).

74.  He underwent five minutes of traction, complaining to nurse Outman that it hurt the whole time.  (Exh. A, p. 125).

75.  The next day traction at the weight of ½ lb. continued, lasting only 4 minutes before plaintiff demanded its removal. The afternoon traction session was similar. (Exh. A, pp. 127-128).

76.  That day, Dr. Funk also had a lengthy discussion with Mr. O'Farrell, explaining to him at length the pathophysiology of degenerativejoint disease and disc disease, the expected symptoms, course, and the reasons for the therapeutic regime being administered to him.  Later that day, nurse Zehr noted that she observed Mr. 0'Farrell in a relaxed position on his bed, resting his head on the wall and taking on the phone, until he saw her looking at him, whereupon he immediately pulled up his right arm and tilted his head to the side. (Exh. A, pp. 128-129).

77.  On Mar 11 , 2004, nurse Shipley noted that she could hardly put the traction harness on plaintiff because he was bending his neck to the side.  He kept it on for three minutes then asked that it be removed.  She removed the traction harness. (Exh. A, p. 132).

78.  He was seen that afternoon by Dr. Dennis Larson, who noted he was holding his head and shoulder in the same, awkward position.  He was told to work on relaxation and on movement of his neck and shoulder as a whole.  His orders were continued. (Exh. A, p. 133).

79.  That evening he had traction which he tolerated for three minutes before insisting on its removal.  (Exh. A, p. 134).

80.  The next morning, Mar. 12, he tolerated traction for only one minute before demanding it be removed.  (Exh. A, p. 136).

81.  A nurse noted in his medical records that O'Farrell was observed holding his head upright and holding his arm loosely while he typed in his cell.  (Exh. A, p. 137).

82.  Over the next five days, Mr. O'Farrell underwent traction only once more, on Mar. 13.  He then refused to undergo any more traction.  He was regularly observed relaxed, typing in his cell.  On Mar. 16, 2004, Dr. Funk noted that Mr. O'Farrell had refused to undergo any more traction.  He therefore discontinued that treatment and ordered up to three cervical epidural steroid injections.  (Exh. A, p. 148).

83**.**  On two occasions later that day, a nurse documented that Mr. O'Farrell sat in his cell typing, in normal posture.  (Exh. A, pp. 148-149).

## Other Therapies Attempted

84.  He was seen by Dr. Choudry on Mar 18,2004.  He reported that he had not much changed and had bilateral tingling to his elbows.  Valium helped him sleep but didn't affect his pain.  His physical exam was essentially unchanged - he had no tricep atrophy, norrnal reflexes of his biceps and triceps, and no fasciculation (twitching).  The doctor noted that they were awaiting his epidural steroid injections.  (Exh. A, p. 151).

85.  Dr. Long wrote a letter to Mr. O'Farrell (cc'ing Dr. Funk) on March 19, 2003.  She noted Mr. O'Farrell wrote to her on Mar. 13, complaining that the traction was aggravating his pain.  She indicated it would be appropriate to discontinue traction.  Dr. Funk entered orders

discontinuing traction (see below). She also noted Mr. O'Farrell had discussed laminoplasty with Dr Trainor, and expressed her disinclination for that procedure in his case. She noted that she had spoken with Dr Funk a few weeks prior and that she believed he was going to seek a second surgical evaluation. (Exh. A, p. 268).

86. Dr. Funk wrote a discharge note (from the Infirmary) on the chart on the same day. He noted that Mr. O'Farrell was admitted to the infirmary on Mar. 1, 2004 for cervical traction and narcotic therapy for his right cervical radiculopathy. He refused the minimal traction prescribed. He had normal strength right hand grasp and his arms were symmetrical. He had no muscle atrophy or twitching. Dr. Funk diagnosed him with right cervical radiculopathy and personality disorder. Dr. Funk explained the epidural steroid injections he was ordering to Mr. O'Farrell. He cleared him for any work which did not require him to use his right arm for three months, and instructed him to do range of motion exercises on his neck four times a day. He was then discharged to the cell house. (Exh. A, p. 153).

87. While on the block, Mr. O'Farrell went to sick call once before he was sent to Morris Hospital for injections. The night before, Dr. Funk noted on the chart that the hospital anesthesia department called to give pre-procedure instructions. Mr. O'Farrell was to receive his normal diet before the procedure, and not be held from food (NPO). More importantly, he was to have no aspirin or NSAIDS (including Motrin) for, the three days over which he would receive the injections. This was explained to Mr. O'Farrell, who signed a statement indicating his understanding. (Exh. A, pp. 157, 21 8).

88. A nurse noted that when he signed this consent, he did so with his right hand, placing the document against the wall at eye level. (Exh. A, p. 158).

89. On Apr. 16, 2004, Mr. O'Farrell was taken to Morris Hospital for steroid injections by Gary L. Koelm, M.D. (Exh. A, pp. 269-271). He was injected and returned to Pontiac.

90. On April 22, 2004, Mr. O'Farrell reported to sick call and was seen by an R.N. He told her that he was still in pain and that the steroid injection did not work. He was given Motrin and Robaxin. (Exh. A, p. 159).

91. On May 12, 2004, he was seen by Dr. Funk. He told Dr. Funk that the injection didn't work. He complained of burning pain over his right suprascapular area radiating down his right arm, and numbness in his right hand. He held his right shoulder shrugged and his head flexed to the right and asserted that it had been fixed in that position since September 2003. On examination his arms were symmetrical. His front right shoulder was very tender and he complained of pain with minimal motion. Dr. Funk noted that his bizarre posturing was not consistent with his clinical findings or reported history. Dr. Funk ordered that the second epidural steroid injection proceed and that Mr. O'Farrell was agreeable. (Exh. A, p. 217).

92. He ordered an X-Ray of the right shoulder to again check his status and scheduled him for the orthopedic clinic in June. (Exh. A, pp. 161-163, 306).

15

93. He was seen by a CMT and by Dr. Choudry before the ortho clinic and his medications were refilled. On May 20th and 21st a CMT noted that he walked past Mr. O'Farrell's cell and observed him standing in normal, relaxed posture, talking to his cell mate, without flexing his shoulder or head. (Exh. A, pp. 165-166).

94. On the May 27, the CMT noted that Mr. O'Farrell again was in a normal posture until he realized he was being observed, whereupon he assumed his flexed shoulder-head position. (Exh. A, p. 167).

95. On June 1, 2004, Dr. Marie Long, the neurosurgeon, sent a letter to Mr. O'Farrell, responding to a letter he sent her on May 11, 2004. Dr. Long wrote as follows, *in pari materia* :

> Subsequent to your second office visit, Dr. Funk and I spoke by phone. We discussed other alternatives to surgery including traction and an epidural steroid injection. I felt that these alternatives would be safe to try, and Dr. Funk was going to initiate those treatments.

> As well, I would emphasize that I have concerns about the chances of success of any surgery in someone with your symptoms and with the fairly nonspecific and not definitive X-Ray findings. 1 would again stress that although surgery is an option, it is not one which has a definite chance of success.

(Exh A, p. 251).

96. On June 15, 2004, he was seen in the orthopedic clinic. The orthopod noted that O'Farrell had undergone the epidural but claimed it did not help. He complained of numbness and tingling in his right hand and held his neck and shoulder in a rigid postule. The doctor ordered a referral back to Dr. Long f or reevaluation. (Exh. A, pp. 168-69).

97. He was seen on June 17 by Dr. Choudry for elbow pain. Dr. Choudry noted that Mr. O'Farrell's posture was much better and that he wasn't laterally flexing his head. (Exh. A, p. 171).

98. He was treated again for elbow pain by another doctor on June 20,2004. He was examined and given medication. He was advised not to sleep with his arm extended and diagnosed with mild cubital tunnel syndrome and mild epicoridylitis. (Exh. A, p. 172).

99. He was seen a couple of times by physicians and his pain medications were continued and renewed. (Exh. A, p. 173).

16

100.  He then saw Dr. Choudry on .July 22, 2004.  He said he had filed a grievance because his pain was still present.  His complaints were the same.  Dr. Choudry noted he was "aggressive and demanding."  He still had no muscle wasting.  His neck motions were limited "voluntarily."  Dr. Choudry noted that he would refer Mr. O'Farrell's case to the medical director for follow up.  His medications were renewed.  He noted the same diagnosis and added that he was engaging in "manipulative behavior."  (Exh. A, pp. 176-77).

101.  In August, he was seen twice by Dr. Larson and once by Dr. Choudry and his symptoms were treated.  He was variously noted to be assuming his awkward posture and on another occasion not exhibiting it.  (Exh. A, pp. 179-1 83).

102.  He then saw Dr. Funk again on August 27, 2004.  Dr. Funk noted his continued strange posture.  He displayed no objective signs of pain and no atrophy.  Dr. Funk reviewed his record.  He noted a continuing diagnosis of degenerative joint disease cervically and right upper extremity parasthesia.  Dr. Funk ordered a repeat cervical spine X-Ray.  (Exh. A, p. 307).

103.  He authorized a low bunk permit.  He also ordered a neurology consult at the University of Illinois, and a cervical myelogram as additional testing.  (Exh. A, pp. 183-184, 220-224).

104.  Dr. Funk saw Mr. O'Farrell again on September 10, 2004. He held the same strange posture and claimed he was stuck that way. He was joking with nursing and security staff and did not appear to be in discomfort. Dr. Funk reminded him that he had a neurological consult coming up**.** He further told him that the posture he was assuming placed abnormal strain on his neck and shoulder joints and that he should stop it. (Exh. A, pp. 190-191).

105.  He continued to be seen by physicians and CMTs pending his neurology workup. His complaints  were assessed and his pain medications adjusted as needed.  (Exh. A, p. 189).

106.  On November 8, he was examined by neurologist Claudia M. Le Moyne, M.D. (Exh. A, pp. 325-239).

107.  Dr. L.e Moyne noted Mr. O'Farrell's history, his physical presentation and test results.  She assessed him with "numbness, pain and muscle spasm, most likely due to multiple cervical disc herniations and possibly aggravated by trauma."  She recommended a neurosurgery consult.

108.  On November 15, 2004, Dr. Funk noted in the chart that he had received the opinion of the neurologists at the University of Illinois who examined Mr O'Farrell. He noted their recommendation for a neurosurgical consult and ordered it. He further noted that the neurosurgical workup would occur in two months.  (Exh. A, p. 190).

17

109.  Mr. O'Farrell reported to Dr. Larson on Dec. 2, 2004.  His presentation had changed little.  Dr. Larson examined him and ordered his pain medication.  He also noted that a neurosurgical appointment was pending.  (Exh. A, p. 191).

110.  0n December 21, 2004, Dr. Funk scheduled an appointment for Mr. O'Farrell for a second surgical opinion at the University of Illinois at Chicago.  That was scheduled for January 3, 2005.  (Exh. A, p. 252).

**Second Neurosurgical Opinion**

111.  Mr. O'Farrell was seen by a neurosurgeon, Dr. Ben Z. Roitberg, in Chicago on January 3, 2005.  Dr. Roitberg took his history and performed a physical examination, with findings consistent with prior findings.  He noted the results of the tests Mr. O'Farrell had been given - his CT's, EMGs and MRIs, and deemed it necessary to update them.  He ordered MRIs of the cervical spine and right shoulder, both  with and  without contrast, a needle EMG, return to the office in two to three weeks, and that his current regimen of pain medications be continued.  (Exh. A, pp. 330-331).

112. That same day, Dr. Frank ordered precisely  what Dr. Roitberg suggested.  He scheduled a follow-up appointment for Jan. 31, 2005.  (Exh. A, pp. 247-249).

113.  MRI and EMG were performed in Jan. 2005.  (Exh. A, 254-255)

114.  The initial orders were entered by Dr. Vade.  Later that day, Dr. Funk approved these orders and put the referrals in line.  (Exh. A, p. 192).

115.  Mr. O'Farrell was sent out for the MRIs on Jan. 18, 2005.  (Exh. A, pp. 332-3.33).

116.  On Jan. 26, 2005, in a chart note, Dr. Funk noted that the MRI of the cervical spine had been completed, but that the imaging center had not performed the right shoulder scans that had been ordered.  He again ordered that these scans be performed. (Exh. A, p. 193)

117.  They were scheduled for Feb. 16,2005. (Exh. A, p. 245).

118.  He also ordered an additional neurosurgery appointment which was scheduled for March 14,2005.  (Exh. A, p. 227)

119.  He was seen by RNs, CMTs, Dr. Larson and Dr. Choudry several times in February and March and was noted to be doing "the same."  His medications were renewed.  (Exh. A, pp. 194-197,102-104)

120. Plaintiff was then scheduled for a C3-7 laminoplasty at the University of Illinois medical center for April 29, 2005.  Dr. Funk  wrote the order for his surgery.  (Exh. A, pp. 234-235).

18

121.  Shortly thereafter, Dr. Funk retired as medical director at Pontiac, and Dr. Dennis Larson assumed the post.  (Exh. B).

## Post-Operative Care

122.  On April 29, 2005, Mr. O'Farrell was admitted to the University of Illinois at Chicago Medical Center for surgery.  Dr. Roitberg  performed the procedure, which  was uneventful.  Mr. O'Farrell was kept in the hospital until May 2, 2005, when he was discharged. He was observed to have significant improvement in his right hand numbness and tingling after the surgery. He was discharged with instructions to wear a Miami collar until he returned to see Dr. Roitberg.  (Exh. A, pp. 334-3.36).

123.  On May 9, 2005, he complained of drainage from his incision and was examined by a nurse.  (Exh. A, p. 308).

124.  She found a moderate amount of serosanguinous drainage and believed the incision site was infected.  He was admitted to the infirmary and followed closely. His dressing was regularly changed and he was placed on antibiotics.  Within about 24 hours his infection was dry and his infection had cleared and he returned to his cell block.  (Exh. A, pp. 308-31 5).

125.  On May 16, 2005, Mr. O'Farrell was sent out for a post-operative appointment with Dr. Roitberg.  (Exh. A, pp. 239,337).

126.  Dr. Roitberg  noted that he had some incisional drainage on May 9, 2005 and was taking the antibiotic Levaquin.  He changed that to Keflex.  His orders were that Mr. O'Farrell could remove his collar for 10 to 15 minutes at a time, and that the collar could come off in two weeks.  The incision  was to be monitored and Keflex continued.  He was to return in one month. (Exh. A, p 337).

127.  On June 3, 2005,  Dr Larson saw Mr. O'Farrell to recheck his status after neck surgery.  He noted that he had a decrease in neck pain and no numbness or tingling in either extremity.  He was doing his exercises and range of motion training.  He had no neck ache.

128.   On .June 20, 2005, Mr. O'Farrell had a second post-operative appointment.  (Exh. A, p. 242).

129.  The defendants do not possess a record of this appointment.  However, the record does reflect Mr. O'Farrell was seen by Dr. Larson on June 24, 2005.  Dr. Larson noted Mr. O'Farrell was feeling well and doing well.  He told Dr. Larson that he was released by the neurosurgeon and had no further follow-up appointments.  Dr. Larson noted his incision had healed and he had good range of motion in his shoulder and neck.  He concluded "exam stable." (Exh. A, p. 324).

**Discussion and Conclusion**

Deliberate indifference to a serious injury or medical need violates a prisoner's rights under the Eighth Amendment to be free from cruel and unusual punishment. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001), *citing Estelle v. Gamble*, 429 U.S. 153, 182-83 (1976). The injury or need must be objectively serious, *and* the official must personally know of the risk and consciously disregard it. *See Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999); *Mathis v. Fairman*, 120 F.3d 88. 91 (7th Cir. 1997); *Wynn v. Southward*, 251 F.3d at 593 (2001). An objectively serious injury or medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Chapman*, 241 F.3d at 845, *quoting Zentmyer v. Kendall County* 220 F.3d 805, 810 (7th Cir. 2000)(*quoting Gutierrez v. Peters* 111 F.3d 1364, 1373 (7th Cir. 1997)). An objectively serious condition also presents itself if "'failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain.'" *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999), *quoting Gutierrez*, 111 F.3d at 1373.

To establish 42 U.S.C. Section 1983 liability for denial of medical care, an inmate must demonstrate that he was suffering from an objectively serious medical condition that the defendants knew about but ignored. *Gleeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005); *Board v. Farnum*, 394 F.3d 469,479-80 (7th Cir. 2005). The subjective component (deliberate indifference) does not encompass negligence or even gross negligence. *Id.*, *citing Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991); *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Negligence or even gross negligence does not give rise to an Eighth Amendment claim, but blatantly inappropriate treatment or intentional mistreatment is actionable under § 1983. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996); *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir 1974). The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense. Deliberate indifference is more than negligence or gross negligence–it "'approaches intentional wrongdoing,'"'essentially a criminal recklessness standard, that is, ignoring a known risk.'" *Johnson v. Snyder*, 444 F.3d 579 (7th Cir. 2006).

Courts examine the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs. *Walker v. Peters*, 233 F.id 494, 501 (7th Cir. 2000). The prisoner must "show that the prison official was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health or safety." *Wynn*, 251 F.3d at 593, *citing Farmer v. Brennan*, 511 U.S. at 837; *Zentmyer*, 220 F.3d at 811. A prisoner is not required to show that he or she was "literally ignored." *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)(jury could find deliberate indifference, "[i]f knowing that a patient faces a serious risk of appendicitis, the prison official gives the patient an aspirin and an enema and sends him back to his cell."). Deliberate indifference may also be inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision on such a judgment."

*Estate of Cole v. Pardue*, 94 F.3d 254, 261-62 (7th Cir. 1996); *see also Collingnon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998)(deliberate indifference may be established if "response so inadequate that it demonstrated an absence of professional judgment, that is, that nominally competent professional would not have so responded under the circumstances."). However, malpractice or disagreement with a doctor's treatment decisions cannot be the basis for an Eighth Amendment challenge. *Steele v. Choi*, 82 F.3d 175, 178-79 (7th Cir. 1996); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). A prison doctor's decision not to follow an outside specialist's recommendations may, however, raise an inference of deliberate indifference. *Gil v. Reed*, 381 F.3d 649, 663-64 (7th Cir. 2004).

On its face, in his amended complaint, O'Farrell complains that Dr. Funk refused to order a surgery that O'Farrell and/or another of his treating doctors felt was necessary. However, this fails to state a Section 1983 Eighth Amendment claim. A difference in opinion between physician and patient concerning the adequacy of medical treatment actually provided does not give rise to a constitutional claim under § 1983. *United States ex rel. Lawrence v. Ragen*, 323 F.2d 410 (7th Cir. 1963). Even differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference. *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). Courts must show deference to the judgment exercised by a qualified professional. *Youngberg v. Romeo*, 457 U.S. 307,322, 102 S. Ct. 2452, 2461, 73 L. Ed 2d 28 (1982).

The medical records establish that Dr Funk did not cavalierly delay or refuse to allow the plaintiff to undergo surgery. The ranges of treatments provided on the orders of Dr. Funk objectively demonstrate that Dr. Funk was not ignoring O'Farrell's problem, but trying to treat it less invasively. O'Farrell was instructed in range of motion and strengthening exercises, he received cervical traction and epidural steroid injections. Dr Funk tried several times to persuade O'Farrell to be admitted to the infirmary to receive stronger narcotics to alleviate his pain. O'Farrell was constantly medicated for pain and any time he complained that it wasn't adequate his prescriptions were adjusted. He underwent several MRI's, multiple x-rays, nerve conduction studies, and other tests. Only when these avenues failed did Dr. Funk then order surgery. These facts of record, which Mr. O'Farrell cannot dispute, make plain that Dr. Funk had a treatment plan. It was not, however, that which Mr. O'Farrell wanted. That is inadequate to state a claim of deliberate indifference.

Mr. O'Farrell made his own desires clear very early on. He wanted surgery. Lest there be any doubt, the defendants have referred to his letter to Dr. Funk of Nov 23, 2004 (Exh. D, p 1). Mr. O'Farrell began:

> I am writing you to inquire of your intent to surgically repair the damaged discs within my neck which has continued to cause me severe pain and burning since August 2003**.**

Mr. O'Farrell goes on to ask whether Dr. Funk is ever going to give him the surgery or whether he plans to give him Motrin "for the rest of [his] life," and accuses Dr. Funk of deliberate

indifference.  Dr. Funk's response equally illustrates his intentions with respect to Mr. O'Fanell's complaints:

> This is in response to your recent letter with multiple questions.  This response is limited to medical concerns expressed in your recent letter.  Dr. Long did not recommend surgery as treatment in your case**.**  Non-surgical forms of treatment have not been "completed."  Patients have safely taken Motrin for decades, the medical staff is able to monitor for potential adverse effects of this medication.

In order to thoroughly respond to the allegations of the amended complaint the defendant also tenders the Affidavit of Dr. Funk.  (Exh. B).  Dr. Funk denies that he ever told Mr. O'Farrell that he did not have degenerative disc disease.  Dr. Funk denies ever having refused a recommendation or order of any other physician treating O'Farrell.  (Exh. B, Para.  4-7, 39).   In fact, the medical records are rife with Dr. Funk's orders tracking precisely the treatment each physician recommended.  O'Farrell alleges Dr. Smith and Dr. Ngu told him they would refer him to an orthopedist, but there is nothing in the records to substantiate this.

The plaintiff's principal allegation that a treatment recommendation was "rejected" relates to Dr Long's offer of surgery.  (Exh. A, pp 80, 251, 264-265).  It seems plain from Dr. Long's consult notes that she felt surgery was a viable option with a 70% probability of success.  However, once she discussed the case with Dr Funk, they both agreed to attempt more conservative therapies before resorting to surgery.  This court recognizes that doctors are permitted to consult with colleagues and formulate a collective treatment plan.  In her letter to O'Farrell of June 1, 2004 (Exh. A, p. 251), Dr. Long dispels any doubt that she concurred fully in the treatment pursued.  She wrote:

> As  well, I would emphasize that I have concerns about the chances of success of any surgery in someone with your symptoms and with the fairly nonspecific and not definitive X-Ray findings. I would again stress that although surgery is an option, it is not one which has a definite chance of success.

(Exh. A, p. 251).  It is noteworthy that the surgery Dr. Long recommended, a discectomy and fusion, is not the surgery which O'Farrell ultimately underwent.  Dr. Funk never ruled out the possibility of surgery, and, indeed, it was Dr. Funk who ordered that it proceed. (Exh. B, I?/ 22,37).

The defendants assert that the root of this case is simply this:  O'Farrell made up his mind early on that he should undergo surgery.  Further, defendants assert that Dr. Funk never ruled out surgery, but wanted to exhaust less invasive remedies first. "Mere disagreement, such as this, over the course of treatment does not establish an Eighth Amendment violation." *Warman v. Funk*, 119 Fed.Appx. 789, 791, (7th Cir., 2004); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th

Cir. 2001); *Ciarpaelini v. Saini*. 352 F.3d 328, 331 (7th Cir. 2003).  Such an exercise of medical judgment is within Dr. Funk's discretion, and does not give rise to a Section 1983 claim.

Further, there is no colorable claim that "deliberate indifference" can be found in - the delay before the plaintiff underwent surgery or the delay before he was provided with the traction therapy or delay for any other procedures of treatment.  Mere delay in the provision of medical care does not automatically state a deliberate indifference claim.  "'An inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed."'  *See Langston v. Peters*, 100 F.3d 1235, 1240-41 (7th Cir. 1996).  Here, the plaintiff has not provided placed verifying medical evidence in the record that establishes a detrimental effect of delay in any medical treatment for him.  "Delay in provision of medical treatment does not result in a violation of constitutional rights where the plaintiff does not indicate that he suffered permanent damage from the delay."  *Martin v. Tyson*, 845 F.2d 1451, 1458 (7th Cir.), *cert. denied,* 488 U.S. 863 (1988); *Shockley v. Jones*, 823 F.2d 1068, 1072 (7'' Cir 1987).  This is all the more true where any "delay" is a result of a conscious attempt to pursue alternative treatment, and not neglect or red tape.

Nothing raised in O'Farrell's response materials provides evidence competent to support his claims or rebut defendants' entitlement to judgment as a matter of law.  O'Farrell's primary means of rebutting the defendants' motion is to take issue with the motives of the defendants.  He actually disputes few of the facts, and offers no "new" material facts.  O'Farrell accuses Dr. Funk of vindictively refusing to order the treatment which other providers recommended.  He characterizes Dr. Funk as an incompetent physician who mean-spiritedly refused to follow the recommendations of other doctors out of spite. However, O'Farrell's opinions are not evidence and cannot defeat an otherwise appropriate motion for summary judgment.  The facts demonstrate that he received consistent attention to his complaints, that multiple attempts to treat his pain were pursued, and that he was ultimately given the surgery which he sought.

The primary fact that O'Farrell disputes is the assertion by the defendants that the unusual position he assumed, tightening his shoulder and bending his neck to the side, was fabricated by O'Farrell in an effort to exaggerate his symptoms whenever medical personnel were around.  The defendants assert that the plaintiff adopted this position as it was what he believed someone suffering from cervical radiculopathy would look like – there is no genuine anatomic reason for his posture.  Further, Dr. Marie Long referred in her report to Dr. Funk that O'Farrell had "evidence of pain behavior," in her first exam, and on her second exam to "definite non-physiologic findings on exam."  (Exh. A, pp. 261, 264).  In order to contest this, O'Farrell offers dozens of "Affidavits," of two kinds. (See exhibits to plaintiff's response [40]).  The first group consists of identical typewritten statements which were signed by many inmates, attesting that:

> During this time every time I saw Mr. O'Farrell, his right shoulder was up in a shrugged position and his head was leaning over to the right.

23

There are at least thirty (30) of these statements signed by other inmates on the same form. Even if every one of these statements is correct and O'Farrell's posture was genuinely contorted, this does not establish any fact which would preserve this case from summary judgment. The second group of "affidavits" consists of another thirty-plus identical statements, but none of these are actually acknowledged by the person allegedly attesting to Mr. O'Farrell's facts. Each is signed by O'Farrell. He writes that he spoke to a named Lieutenant or correctional officer, who told him that he or she was prohibited by departmental policy from offering him a signed statement, but that they would have corroborated that he was observed in this unusual "shrugged" posture. Again, none of these would establish anything other than the veracity of O'Farrell's posture, which has no bearing on whether he was treated for his condition. He received a variety of testing and treatment culminating in surgery.

In his response, the court notes that OFarrell's only response to the fact that he has provided no expert testimony in support of his claim is to state that he will call Dr. Marie Long, Dr. Sinha, and others as experts at trial. However, O'Farrell must first survive the defendants' summary judgment motion before he can proceed to trial. There are seventeen (17) affidavits, all signed by O'Farrell, in which he states, for example, "if I could depose X person, they would testify to Y." O'Farrell states, for example, that he will depose Dr. Marie Long, the neurosurgeon first consulted by Dr. Funk. O'Farrell states that he will elicit from her the fact that she did not originally recommend cervical traction but that she said, instead, that ordering these therapies would be appropriate. (As she communicated to him in a letter explaining her *agreement* with Dr. Funk to defer surgery in favor of exhausting conservative treatment). The plaintiff's affidavits mostly pertain to medical personnel both in and outside of the Pontiac Correctional facility, from whom O'Farrell proposes to elicit expert opinions. When he submitted his response to defendants' summary judgment motion was the time to offer testimony that Dr. Funk's failure to order surgery at the time Dr. Long first recommended surgery was without medical basis or constituted deliberate indifference. The court agrees with the defendants. Simply naming doctors who examined or treated him falls far short of fulfilling the requirement that the plaintiff produce expert testimony to establish that he was wrongfully denied necessary care. O'Farrell has not produced any expert testimony to establish that he suffered any injury as a result of any delay or refusal of treatment. Therefore, the defendant, Dr. Funk is entitled to summary judgment as a matter of law.

Furthermore, the defendant Peggy Shipley is also entitled to judgment as a matter of law because the mere fact that the plaintiff claims the treatment he received was painful does not state an Eighth Amendment Claim. The plaintiff alleges Nurse Peggy Shipley violated the Eighth Amendment by forcing him to submit to cervical traction. The defendants have submitted evidence, including the plaintiff's medical records, from which no reasonable person could conclude O'Farrell's allegations are meritorious. Furthermore, the plaintiff has failed to produce actual evidence to the contrary which is sufficient to create a genuine issue of material fact. The defendants further contend that whatever pain O'Farrell claims to have suffered during traction was *de minimis*, and does not rise to the level of "cruel and unusual punishment" sufficient to impose liability on Nurse Shipley.

The plaintiff contends that on three specific occasions, March 2, 2004, March 4, and March 9, he was administered traction by Nurse Shipley.  On the first occasion, his traction weight had already been reduced to 2 ½ lbs.  He claims that when traction began he experienced immediate, intractable pain and pleaded with her to remove it, but she refused.  He alleges further that he attempted to remove it himself; and she yelled at him not to remove it.  He states that she told him that if he didn't want the traction, he would have to sign a refusal of treatment form, then acknowledges that he refused to sign it when traction was removed.  She did not attempt to reinitiate traction at that time. (Amended Complaint, Count 2,77 5-8).

On the second occasion, the plaintiff alleges Nurse Shipley began with only 1 lb of traction, and that he experienced the same results.  He asserts that he held the weight cord so that it would apply no pressure and that Nurse Shipley called Dr. Funk and reported this.  Dr. Funk allegedly told her to remove the traction, which she did. (Amended Complaint., Paras.  9-10).

On the third occasion, the weight was just ½ lb, a mere eight ounces.  O'Farrell contends this caused immediate pain and that he asked that it be removed but Nurse Shipley did nothing, in retaliation for his allegedly reporting her to the nurse supervisor, and that Shipley left the traction on for five minutes.   (Amended Complaint, 71 12-14).

The plaintiff's medical records reveal the facts.  First, there were more than three occasions on which Nurse Shipley applied traction. She was among five or six different nurses who applied traction, and she did not apply it any more than anyone else.  Nor did she experience results different than any other nurse.  O'Farrell complained every time and often removed the traction weight himself.

The first time Nurse Shipley actually applied traction to Mr. O'Farrell was actually Mar. 2, and the weight was only 2 lbs.  Nurse Shipley noted the following in the chart: (handwritten notes) (Exh. A, p. 91).  Nurse Shipley provided traction next on Mar. 4. She noted that O'Farrell held his neck so far to the right that it was nearly impossible to put the traction harness on.  Immediately he told her "take it off, take it off, I can't stand it."  She encouraged him to relax and calm down, whereupon he reached up and disconnected the rope suspending the weight.  She discontinued traction and noted his non-cooperation on the chart. (Exh. A, p. 99).  In the afternoon of the same day, traction was tried again, as ordered.  O'Farrell kept the 1 lb traction  weight on for about 3 minutes then removed it himself.  She again noted his non-compliance with the therapy and poor impulse control.  (Exh. A, p. 100).  On Mar. 5, 2004, O'Farrell again kept the weight on for about 2 minutes then removed it himself. (Exh. A, p. 104).  Later that afternoon traction  was tried again.  Nurse Shipley noted that he demanded that the weight be removed, and when she did not do so, he again reached up and removed the weight, himself.  (Exh. A, p. 105).  On Mar. 8, 2004, Nurse Shipley applied ½ lb of  weight.  She noted he tolerated this well for 5 minutes then demanded that it be removed, which it was. (Exh A, p. 116).  The next time Nurse Shipley tried to apply traction was on Mar. 9, 2004.  She noted that he tolerated the 1/2 lb of traction well, then removed the weight after five minutes.  She wrote (in part): (Handwritten Notes). (Exh. A, p. 121).  On Mar. 11, 2004, Ms. Shipley again applied traction at the ½  lb weight.  He kept it on for three minutes then demanded it be

removed, which she did. (Exh. A, p. 1.32).  That was the last  time Nurse Shipley was on duty when traction was to be applied.  Several days later Dr. Funk discontinued the attempted treatment.

According to both the medical records and the plaintiffs own amended complaint, Peggy Shipley was following doctor's orders when she applied traction to O'Farrell.  She even noted that she was required to do so in her chart note of Mar. 9, 2004.  The court agrees with the defendants.  Ms. Shipley cannot be held liable merely because the treatment she provided, under doctor's orders, was painful.  She is no more liable for this than she would be for inflicting pain when giving an injection.  The question then, is whether she inflicted pain on O'Farrell which was above and beyond what the traction device naturally caused.

Of great significance is the fact that  O'Farrell was capable of removing the harness himself, which he acknowledges, and which is repeatedly documented in his medical chart. O'Farrell does not allege or show proof that Ms. Shipley ever forcibly restrained him, or that she physically prevented him from removing the whole harness or simply the weight.  He merely alleges she did not remove it immediately upon his request.  Furthermore, there is no claim that she ever reapplied the traction when he disabled the device, himself.  He was simply admonished, his non-cooperation was noted in the chart, and he was returned to his Infirmary cell.  Ms. Shipley was under orders to treat O'Farrell with traction.  When he cried out with claims of pain under only 8 oz. of weight, it was appropriate, if not incumbent on her to encourage him to relax and proceed with the treatment.  This does not make her responsible for inflicting cruel and unusual punishment.

The foregoing facts are derived from the undisputed material facts as well as from the plaintiff's amended complaint, as well as the medical records.  Based upon these facts, Nurse Shipley did not act with deliberate indifference to his serious medical needs or in retaliation for his reporting her to her supervisor.  To the contrary, she was trying to apply a treatment which was prescribed for the very purpose of treating his medical needs.  That he claims to have suffered pain does not make his claim sufficient to meet the elements required for deliberate indifference.

The defendants assert that Ms. Shipley is entitled to judgment based upon these indisputable material facts, alone.  However, the defendants made an even further brief proffer of their own evidence with regard to the claim against Shipley.  First, in response to one of many letters and grievances O'Farrell filed pertaining to his treatment, Dr. Funk directly addressed his claims that he was tortured by the nurses with traction. Dr. Funk wrote:

> I am responding to Mr. O'Farrell's April 26, 2004 letter that was recently forwarded to me.
>
> Mr. O'Farrell alleges that the medical staff threatened and coerced  him, and forced medical treatment upon him.

Mr. O'Farrell's allegations of threats and coercion were addressed by response to many grievances on this same issue, all allegations made by Mr. O'Farrell were denied by the individuals he alleged had made specific statements.

Mr O'Farrell further alleges that he was forced to receive traction and that this caused pain and made his medical condition worse. Mr O'Farrell was not forced to have traction and the medical file shows that he frequently refused this treatment. Cervical traction is appropriate treatment for his condition and would not cause pain or worsen his condition.

(Exh. D, p. 3). In addition, Dr. Funk offers, by way of Affidavit, his opinion that Mr. O'Farrell was exaggerating, or entirely fabricating his claims of pain because he did not want the treatment. He explains that cervical traction works by extending the neck and consequently enlarging the apertures through which the nerve roots pass, providing more room and relieving pain from herniations. Dr. Funk states that it is not credible that Mr. O'Farrell would have suffered excruciating pain as a result of the minimal traction he underwent. It is his opinion that Mr. O'Farrell was able to undergo the traction and that he significantly exaggerated, or fabricated, his complaints of pain because he did not want to cooperate with the conservative medical management approach which he was receiving. (Exh. B, In 23-24).

Dr. Funk further offers:

At all times when he was undergoing traction, the nurses, including Peggy Shipley, who applied traction were compliant with Mr. O'Farrell's demands that the traction be stopped. Each time it was attempted, it was applied for no longer than Mr. O'Farrell permitted it to be in place, regardless of how unlikely his complaints of pain appeared to be. Mr. O'Farrell was also able to remove the weight cable himself, which he repeatedly did. On Mar. 13, Mr. O'Farrell simply refused to undergo further traction, and it was not forced on him. He remained in the Infirmary for three more days without undergoing any traction."

(Exh. B, 126)

"A court never is required to accept evidence that is inherently incredible or 'too incredible to be accepted by reasonable minds.'" "There must be a degree of substantiality to the evidence proffered in opposition to a summary judgment motion if the motion is to be defeated " *Agosto v. Immigration and Naturalization Service*, 436 U.S. 748, 772-773, 98 S Ct 2081, 2095, 56 L.Ed.2d 677 (US 1978) (Powell & Rehnquist, dissent), citing 10 C. Wright & A. Miller, Federal Practice & Procedure Section 2725, p. 512 (1973); 6 J. Moore, Federal Practice Para. 56 15[4], p. 56-521 (2d ed. 1976), other cites omitted.

Accordingly, Nurse Shipley must be granted judgment as a matter of law.

Even viewing the facts in a light most favorable to the plaintiff, this case is merely a claim in which th eplaintiff disagreed with the discretionary medical judgment of his treating physician. The defendants are entitled to judgment as a matter of law.

**It is therefore ordered:**

1. **Pursuant to Fed. R. Civ. Pro. Rule 56(c), the defendants' summary judgment motion [25] is granted.  The clerk of the court is directed to enter judgment in favor of the defendant and against the plaintiff.  This case is terminated, with the parties to bear their own costs.**
2. **If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment.  Fed. R. App. P. 4(a)(4).  A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal.  *See* Fed. R. App. P. 24(a)(1)(C).  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.  Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).**

**Enter this 21st  day of September, 2006.**


**s/Harold A. Baker**

_____

**Harold A. Baker**
**United States District Judge**

28